**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN ABBOUD, *individually and as Administrator of the Estate of* Nahida Abboud, | ) ) ) ) | CASE NO. 5:15CV02344 |
| Plaintiffs, | ) ) | JUDGE JOHN R. ADAMS |
| vs. | ) ) | |
| LIBERTY MUTUAL GROUP, INC., *et al.*, | ) ) | **ORDER AND DECISION** (Resolving Docs. 32 and 41) |
| Defendants. | ) | |

This matter is before the Court on a motion for summary judgment filed by Defendants LM General Insurance Company and Liberty Mutual Insurance Company (collectively "Liberty"). Doc. 41. The Court finds that no genuine issues of material fact exist as to Plaintiff John Abboud's claims set forth in his Complaint. As such, for the following reasons, Liberty is entitled to judgment as a matter of law, and its motion for summary judgment is GRANTED. Liberty also filed a motion to exclude evidence of a telephone recording. Given the Court's ruling on the motion for summary judgment, the motion to exclude is DENIED as moot.

I.  **FACTS AND PROCEDURAL HISTORY**

This case arises out of two insurance agreements between Dr. Abboud and Liberty – a 2013 auto policy for uninsured/underinsured motorist coverage and a personal liability umbrella policy. The parties do not dispute the underlying facts:

1

Dr. Abboud is a board-certified cardiologist at the Cleveland Clinic who first purchased an automobile insurance policy from Liberty in 2011. Doc. 41-1. The 2011 auto policy included a bodily injury single liability limit of $1,000,000 per accident and an underinsured ("UIM") single limit of $500,000 per accident. Doc. 41-1. Dr. Abboud received a copy of the 2011 auto policy, read and understood it, and had no questions about its terms. Doc. 41-1. When he purchased the 2011 auto policy, he understood that liability coverage would apply if an insured under his policy injured someone else. Doc. 41-1. He also understood that UIM coverage would protect the insureds under his policy if someone else was responsible for an accident but did not have sufficient insurance to compensate the insured for their injuries. Doc. 41-1.

In June of 2012, Dr. Abboud received an unsolicited e-mail from Liberty discussing personal liability insurance coverage. Doc. 41-3. Over a month later, he called Liberty's toll-free customer service line to discuss renewing his auto insurance and to inquire about a personal liability policy ("PLP policy"). Doc. 41-1. Dr. Abboud spoke with Liberty's customer service representative, Daniel Fissel, who provided Dr. Abboud with a quote of split-limit auto insurance coverage. According to the quote, instead of the $1,000,000 in liability coverage, he would receive $250,000 per person/$500,000 per accident liability coverage and $100,000 per person/$200,000 per accident UIM coverage. Doc. 41-1. The split-limits coverage under an was less expensive than the single-limits policy. Doc. 41-4. It is undisputed that Dr. Abboud had no prior business relationship or contact with Fissel. Doc. 41-1.

Dr. Abboud decided to renew his automobile policy with the split limits for a total savings of $99. He received and reviewed the new declarations page and did not call Liberty with any concerns about the policy or its coverage. Doc. 41-1.

2

During Dr. Abboud's discussion with Fissel, the issue of a PLP policy was raised. Fissel did not have the ability to write a PLP policy, so Dr. Abboud was transferred to an unknown sales representative to discuss PLP coverage. Doc. 41-8. Liberty records indicate that Dr. Abboud did not request a quote for PLP coverage until three months after he changed his auto policy to split limits. Doc. 41-8.

On November 21, 2012, Dr. Abboud again called Liberty's toll-free customer service number, this time to apply for a PLP policy. At the time, Liberty did not write UIM coverage in Ohio as part of its PLP policies. Doc. 41-8. Liberty took Dr. Abboud's information in order to process the application and then sent a paper copy of the application for his review and signature in order to complete the application process. Doc. 41-1. The PLP policy application was titled "Personal Catastrophe Liability Policy." Doc. 41-9. No selection was listed for UIM coverage under the PLP policy nor did it list a premium charge for UIM coverage. Doc. 41-9. Dr. Abboud reviewed and signed the application and returned it to Liberty. Doc. 41-1, 9.

Dr. Abboud later received a copy of the PLP policy and reviewed it. Doc. 41-1. He understood the policy provisions and did not remember calling Liberty to voice any concerns or to address any confusion about the coverage spelled out in the policy. The 2012 PLP policy declarations included $2,000,000 of liability coverage, with coverage in excess of $250,000/$500,000 in automobile liability coverage. Doc. 41-1, 10. The policy declarations included only liability coverage, and the policy explicitly excluded UIM coverage. Doc. 41-1, 10.

The next year, Dr. Abboud renewed the auto policy with the same terms and coverage limits as the 2012 auto policy. Dr. Abboud received the 2013 auto policy and again understood

3

those terms and coverage limits, including the difference between liability coverage and UIM coverage. Doc. 41-1. He also renewed the PLP policy, with the terms and coverage limits reflected in the 2012 PLP policy. Dr. Abboud acknowledges that he received and reviewed the 2013 PLP policy, and he made no changes or revisions to the policy. Doc. 41-1.

On August 13, 2014, Dr. Abboud's mother, a covered insured under his policy, was struck by another driver. After the accident, Dr. Abboud received $100,000 from the tortfeasor's insurance company in settlement of all claims against the tortfeasor. Doc. 41-1. Since the tortfeasor's coverage limits were the same as Dr. Abboud's UIM limits, Mrs. Abboud was not eligible for payments under the UIM auto policy. The PLP policy provided no additional coverage since Mrs. Abboud was not responsible for the accident and therefore not eligible for coverage, and the PLP policy did not provide coverage in excess of the UIM auto limits since it was not part of the policy or even available in Ohio as part of the policy.

Because Liberty denied coverage under the UIM auto policy and the PLP policy, Dr. Abboud, individually and on behalf of Mrs. Abboud, filed the underlying action,[1] alleging breach of contract, negligent and intentional misrepresentation, "negligence/breach of fiduciary duty," and "negligent hiring/training/supervision/retention." Doc. 1-1. Dr. Abboud alleges that an unidentified representative of Liberty told him the PLP policy would cover any UIM loss beyond the auto policy, and he relied on the representations despite the language of the policy. While the litigation has been pending, Mrs. Abboud passed away. Dr. Abboud filed a Suggestion of Death, and he is now the representative of her estate. Liberty filed a motion for

---

[1] Dr. Abboud originally filed the action in state court on October 14, 2015, but Liberty removed the action to this jurisdiction on November 16, 2015.

4

summary judgment on all claims, and Dr. Abboud filed a brief in opposition. Doc. 41, 46. The matter is now ripe for decision.

## II. LEGAL STANDARD OF REVIEW

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is material if it is one that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary burdens. *Id.* At 252. Further, on summary judgment, the inferences to be drawn from underlying facts must be viewed "in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The pivotal question in deciding a motion for summary judgment is whether a reasonable fact finder *could* make a finding in favor of either party. *See Anderson* 477 U.S. at 250 ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.").

The initial burden of showing the absence of any "genuine issue" belongs to the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury" or other fact-finder at trial. *Cox v. Kentucky Dep't of Transp.*, 53 F.3d

146, 150 (6th Cir. 1995). A party opposing summary judgment must show that there are facts genuinely in dispute, and must do so by citing to the record. Fed.R.Civ.P. 56(c)(1)(a).

### III. LEGAL ANALYSIS

#### A. Breach of contract, intentional misrepresentation, and negligent hiring, training, and supervision

In his brief in opposition, Dr. Abboud acknowledged that he did not believe there is sufficient evidence to maintain his claims for intentional misrepresentation, breach of contract, and negligent hiring, training, and supervision.  Doc. 46 at FN2.  After reviewing the record in this case, the Court agrees that Dr. Abboud cannot demonstrate a genuine issue of material fact on these three claims.  Furthermore, because Dr. Abboud has had ample opportunity to engage in the discovery process and develop any evidence to support an issue of fact, the Court declines to dismiss these claims without prejudice as suggested in his response brief.  Doc. 46 at FN2.  Instead, the Court hereby GRANTS summary judgment on Dr. Abboud's claims for breach of contract, intentional misrepresentation, and negligent hiring, training, and supervision, resulting in a dismissal with prejudice of all three claims.

#### B. Negligent misrepresentation

The Ohio Supreme Court has defined negligent misrepresentation as "'[o]ne who, in the course of his business, * * * or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their *justifiable reliance* upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.'" *Delman v. City of Cleveland Heights*, 534 N.E. 2d 835, 838 (Ohio 1989) (emphasis in text)

(*quoting* 3 Restatement of the Law 2d, Torts (1965) 126–127, Section 552(1)); *see also Heights Driving School, Inc. v. Motorists Ins. Co.*, 2003-Ohio-1737, ¶41.  Here, Dr. Abboud claims that "either Fissel or Liberty's sales agent" told him that the PLP policy offered the same coverages as the auto policy "but with greater limits."  Doc. 46 at 17.  While the element of justifiable reliance is usually a question of fact for a jury, in this case, the evidence demonstrates that Dr. Abboud cannot demonstrate a genuine issue of material fact as to whether his reliance on any alleged comment was justifiable; and as such, Liberty is entitled to judgment as a matter of law on the claim for negligent misrepresentation.

Dr. Abboud argues that an unidentified person from Liberty told him that the coverage from his PLP policy would be the same as his auto policy.  However, he also acknowledges that he received a copy of the 2012 PLP policy application after this conversation, and the application did not state that UIM coverage was included or that a premium was being charged for UIM coverage.  In fact, Liberty did not even sell UIM coverage in its PLP policies in Ohio at the time in question.  Dr. Abboud admits that he received a copy of the 2012 PLP policy application, read it, understood it, and signed it.

> Q:  Did you review this application when you received it, before you signed it?
>
> A:  Yes.
>
> Q:  Did you understand this to be an application for a personal catastrophe liability policy?
>
> A:  Yes.
>
> Q:  Did you understand that under this application…it's a quote for $2,000,000 of a liability limit.
>
> A:  Yes.
>
> Q:  And, you're paying premiums, if you look at the right-hand column, do you see the dollar amounts?

7

> A: Yes.
>
> Q: You're paying premiums for the things that have a dollar amount listed, did you understand that?
>
> A: Yes.
>
> * * *
>
> Q: [Reading from the policy] UM Coverage? (Where applicable) has two boxes, yes and no, neither box is marked, right?
>
> A: Right.
>
> * * *
>
> Q: Just to the right of the box for no, it says underlying UM limit $, and there's no amount of money, correct?
>
> A: Correct.
>
> Q: And, then, in the box to the right of question No. 5, or Topic 5, there is no premium listed, is there? …
>
> A: Correct.

Doc. 41-1 at 50-54. Despite reviewing the PLP policy and seeing that the UIM coverage box was not checked and that no premium was listed, Dr. Abboud had no further questions for Liberty and signed and returned the application. Later, when Dr. Abboud received the PLP policy itself, again he reviewed it, understood that no UIM coverage was elected on the policy, and made no changes, corrections, or calls to Liberty to discuss the status of UIM coverage in his PLP policy.

> Q: I'm going to show you what's been marked Exhibit L. Do you recognize this to be a copy of the first umbrella policy that you received, which took effect in November of 2012?
>
> A: Yes.
>
> Q: And, you would have reviewed this document when you received it?
>
> A: Yes.
>
> Q: Did you understand this document when you received it?

8

A: Yes, I did.

\* \* \*

Q: All right. Take a look if you would first of all, and, I apologize, I might have already asked you this. You don't remember calling Liberty Mutual to voice any concerns about this policy when you received it, correct?

A: Correct.

Q: You don't remember any confusion that you had on receipt of this policy for what was in it, correct?

A: Correct.

\* \* \*

Q: …So you'll agree with me, there's no reference on page 249 or 250 to uninsured/underinsured motorist coverage?

A: Yes.

\* \* \*

Q: This spells out that Liberty will pay all sums in excess of the retained limit, and up to our limit of liability for damages because of personal injury, or property damage, to which this policy applies, and for which the insured is legally liab[le]. Do you see that?

A: Yes.

Q: Do you understand that as I read to that to you?

A: Yes.

Q: Do you understand that for personal excess liability coverage to apply, the **insured has to be legally liable** under this provision?

A: Under this provision, yes.

\* \* \*

Q: Are you aware of anyone, [who's] an insured under this policy, who's legally liable for your mother's injury?

9

>A: No.
>
>\* \* \*
>
>Q: …Do you find it confusing that this policy lists a set of exclusions where there's not going to be coverage, even when the insured is legally liable?
>
>A: No.
>
>Q: Let's talk about exclusion M on page 255.
>
>A: Okay.
>
>Q: This exclusion says that, reading from the top, **this policy does not apply to personal injury or property damage for uninsured motorists, underinsured motorists,** or any other coverage unless these coverages are specifically listed on your policy declarations, do you see that?
>
>A: Yes.

Doc. 41-1at 59-66 (emphasis added).

Dr. Abboud had another opportunity to review the written policy language, its coverage, and its exclusions when he renewed the PLP policy in 2013 without making any changes to his coverage. Doc. 41-1 at 67-70. Again, Dr. Abboud reviewed the 2013 policy renewal, understood its terms, and made no changes to any of his policies. Doc. 41-1 at 67-70.

>Q: This policy contains the same coverage limit as Policy L that we just looked at.  It renewed in November of 2013, do you see that?
>
>A: Yes.
>
>Q: This policy, again, references under coverage information, personal liability $2,000,000 each occurrence, right?
>
>A: Right.
>
>\* \* \*

>Q:  Again, the coverage provision under Roman Numeral II, before the word exclusions, indicates that it applies when the insured is legally liable, right?
>
>A:  Yes.
>
>Q:  And, you agree under this policy, no one who was an insured under this policy is legally liable for your mother's accident.
>
>A:  Yes.
>
>Q:  You would have received this renewal in the mail, right?
>
>A:  Yes, probably.
>
>Q:  And, you would have had a chance to review it, and see if there was any changes, causes for concern, confusion, etc., right?
>
>A:  Right.

Doc. 41-1 at 67-70.

Looking at the plain language of the policy, which Dr. Abboud admittedly read and understood, the PLP policy only covered certain losses when Dr. Abboud or a family member was liable.  Dr. Abboud admitted the only person liable for Mrs. Abboud's accident was a non-party tortfeasor.  Thus, there was no triggering event under the PLP policy.  Even if there were, UIM coverage was <u>specifically excluded</u> under the plain language of the policy that Dr. Abboud read and understood.  Given all of this, any reliance on representations related to the PLP policy by an unidentified individual – in the face of the clear language of the policy – was not justified as a matter of law.  Liberty is entitled to summary judgment on the claim for negligent misrepresentation.

### C. Breach of fiduciary duty

"In Ohio, an insurance customer has a 'duty to examine the coverage provided and is charged with knowledge of the contents of his or her own insurance policies.'" *Wright v. State Farm Fire and Casualty Co.*, 555 Fed.Appx. 575, 579-80 (6th Cir. 2014) (*quoting Fry v. Walters & Peck Agency, Inc.,* 141 Ohio App.3d 303 (2001)). "Generally, an insurance agent only has a duty to obtain insurance that a customer specifically requests." *Wright*, 555 Fed.Appx. at 580 (*citing Island House Inn, Inc. v. State Auto Ins. Cos.,* 150 Ohio App.3d 522 (2002) and *First Catholic Slovak Union v. Buckeye Union Ins. Co.*, 27 Ohio App.3d 169 (1986). "'Ordinarily, the relationship between an insured and the agent that sells the insurance is, without proof of more, an ordinary business relationship, not a fiduciary one.'" *Wright*, 555 Fed.Appx. at 580 (*quoting Slovak v. Adams*, 141 Ohio App.3d 838 (2001)). In order to establish a fiduciary relationship, the plaintiff must show that "'both parties…understand that a special trust or confidence has been reposed.'" *Id.* (*quoting Slovak v. Adams*, 141 Ohio App.3d 838 (2001)).

Here, there is no colorable argument that a fiduciary relationship creating a special duty existed between Dr. Abboud and Liberty. Reviewing the facts in a light most favorable to Dr. Abboud, while he may have relied generally on Liberty representatives, "…an insured's reliance on his insurance agent is not sufficient, by itself, to establish a fiduciary relationship." *Nichols v. Schwendeman*, 2007-Ohio-6602, ¶ 18. Instead, Dr. Abboud can demonstrate no evidence that a special relationship existed beyond the insured-insurer relationship or that Liberty understood that a special trust or confidence had been reposed.

Each contact Dr. Abboud had with Liberty was initiated by Dr. Abboud calling Liberty at its general, toll-free customer service number. He spoke to the agent who answered the phone, and he never spoke to the same representative more than once. Dr. Abboud's contact with

12

Liberty was so casual and infrequent that he could not remember the name of the representative who allegedly told him that the PLP policy provided UIM coverage. Dr. Abboud points to no special circumstances about his contact with Liberty that would indicate it was anything more than the typical insurer-insured relationship. Further, Dr. Abboud can point to no evidence that Liberty understood that a special trust or confidence was being reposed by Dr. Abboud. As such, he cannot demonstrate a genuine issue of material fact on his claim for breach of fiduciary duty. Liberty is entitled to judgment as a matter of law.

### D. Negligent failure to procure requested insurance coverage

"An agent will be held liable if, 'as a result of his or her negligent failure to perform that obligation to procure insurance, the other party to the insurance contract suffers a loss because of a want of insurance coverage contemplated by the agent's undertaking.'" *Emahiser v. Complete Coverage Ins., LLP*, 53 F. Supp. 3d 1025, 1028 (N.D. Ohio 2014) *(quoting Robson v. Quentin E. Cadd Agency,* 179 Ohio App.3d 298, 305, 901 N.E.2d 835 (2008) (internal quotation marks and alterations omitted)). "Ohio law recognizes a cause of action against an insurance agency for negligent procurement where the agency fails to act with reasonable diligence in providing an insured with requested coverage." *Amankwah v. Liberty Mut. Ins. Co.,* 62 N.E.3d 814, 816 (Ohio App. 1st Dist. 2016); s*ee Minor v. Allstate Ins. Co.,* 111 Ohio App.3d 16, 675 N.E.2d 550 (2d Dist.1996); *Damon's Missouri, Inc. v. Davis,* 63 Ohio St.3d 605, 609, 590 N.E.2d 254 (1992), fn. 2. "Ohio law also recognizes a corresponding duty on the part of an insured to review the insurance policy and know the extent of insurance coverage issued." *Amankwah*, 62 N.E.3d at 816; *see, e.g., Roberts v. Maichl,* 1st Dist. Hamilton No. C–040002, 2004-Ohio-4665, 2004 WL 1948718, ¶ 18; *Rose v. Landen,* 12th Dist. Warren No. CA2004–06–066, 2005-Ohio-1623,

13

2005 WL 752431, ¶ 16; *Kincaid v. Erie Ins. Co.,* 128 Ohio St.3d 322, 2010-Ohio-6036, 944 N.E.2d 207, ¶ 16.

In this case, Dr. Abboud applied for auto and personal liability insurance, and Liberty provided the coverage.  Dr. Abboud testified that he reviewed both his 2012 and 2013 auto and PLP policies, understood their terms, and did not seek to alter or change the terms and did not contact Liberty to correct any coverages.  In 2012, Dr. Abboud requested and received the split-limits auto policy, along with the reduction in premium he requested.  Four months later, he requested a $2,000,000 PLP policy, which he received.  Liberty did not offer UIM coverage in Ohio for PLP policies, and Dr. Abboud acknowledged reviewing the PLP application and seeing that the UIM coverage box remained empty with no premium charged for UIM coverage.  He then submitted the application and later received the policies requested according to the application he submitted.

In 2013, Dr. Abboud requested a renewal of the auto and PLP policies.  Liberty renewed each policy as requested.  Dr. Abboud can demonstrate no issue of material fact as to Liberty's failure to procure requested insurance.  As such, Liberty is entitled to judgment as a matter of law.

### E.  Comparative negligence

Dr. Abboud argues that any failure on his part to "comprehend" the policies falls under comparative negligence and is therefore a question of fact for a jury to determine.  However, the duty that Dr. Abboud owed under Ohio law was to review his policy, which he did.  The extent of his subjective understanding is not an element of any cause of action asserted by Dr. Abboud.

14

Instead, the issue is whether he read the policies, and no question of fact exists on that point. The Court would note that Dr. Abboud testified that he read the PLP policies and understood that 1) the 2012 and 2013 PLP policies did not have the UIM coverage box marked; 2) he was not being charged a premium for UIM coverage under either PLP policy; and 3) UIM coverage was explicitly excluded under the language of both PLP policies. Therefore, there is no genuine issue of material fact as to comparative negligence, and Liberty is entitled to judgment as a matter of law.

### IV. CONCLUSION

Reviewing the facts in a light most favorable to the Plaintiff John Abboud, no genuine dispute of material fact exists on any claim against Defendants LM General Insurance Company and Liberty Mutual Insurance Company. Therefore, Liberty is entitled to judgment as a matter of law, and its motion for summary judgment is GRANTED. Liberty's motion to exclude evidence is DENIED as moot.

IT IS SO ORDERED.

Dated: 02/27/2017 /s/John R. Adams
JOHN R. ADAMS
UNITED STATES DISTRICT JUDGE